### GANGI SEAFOOD, INC.

v.

### ADT SECURITY SERVICES, INC., et al.

### No. CIV.A. 00–3715.

United States District Court, E.D. Louisiana.

June 28, 2004.

Curt Christopher Kronlage, Kronlage & Kronlage, APLC, New Orleans, LA, for Gangi Seafood Inc, plaintiff.

Leslie A. Lanusse, Lisa Lemaire Maher, Adams & Reese, Robert Emmet Couhig, Jr., Jonathan Percy Lemann, Couhig Partners, LLP, James K. Carroll, Stephanie D. Skinner, Fowler, Rodriguez & Chalos, LLP, New Orleans, LA, for ADT Security Services, Inc., Certain Underwriters at Lloyds of London, defendants.

## ORDER AND REASONS

LEMMON, District Judge.

**IT IS ORDERED** that defendant ADT Security Services, Inc.'s Motion for Summary Judgment (Document 63) is hereby **GRANTED.**

### A. Background.

In March 1995 ADT contracted with Reuther's Seafood Co., Inc. to provide burglar and fire alarm services to a seafood processing facility Reuther owned at 600 Mazant Street in New Orleans, Louisiana. Under the contract ADT both installed burglar and fire alarms, and monitored those systems to dispatch municipal authorities when the alarms sounded. The

contract provided that the customer "agrees to pay $1,640.00 per annum, annually in advance for a period of five years effective from the date service is operable under this agreement." The contract was not assignable by Reuther without ADT's written consent.

Plaintiff Gangi Seafood, Inc. began operating at the 600 Mazant Street facility in October 1998, and formally purchased the facility in January 1999. Reuther had prepaid the annual amount due under the ADT contract, ensuring that monitoring service would extend through July 1999. Prior to Gangi taking over the premises in October 1998, a meeting occurred between Reuther; ADT employee Ed Jefferson; Michael Gangi, and Reuther's cousin, David Pippin. Reuther testified that he informed Jefferson that he wanted to assign the contract on the Mazant Street facility to Gangi, and that Jefferson told him that would be acceptable.[1] Reuther testified about what was discussed at this meeting:

When we all sat down, I explained to Ed over the phone previously what was going to be taking place between the facilities, who was going where and what was taking place. And I said, Look, we've got to change over the system that we have to the new people that are going to be operating and eventually owning this property. Look, is it easier—let me just come out and meet him and I'll take care of it while I'm there. And I'll make sure I got a serviceman there.

I remember we had to stand around and talk a while because the serviceman was running late. We sat down, the four of us, talked about specifically what we were doing. That's when I started talking to Ed about can we change the contract and move it over. And he said,

"No, it's going to be easier for me if the contract stays with the facility." So rather than trying to move a contract to a different facility, he said the pricing on this contract is based on servicing this facility, so let's go and do something different.

\* \* \* \* \* \*

[W]hat we decided to do, once I got that information from him, I said, "Well, look, let's just leave it on the property, let Mike use the remainder of the contract that's there, and then you negotiate with Mike on the new contract here." I said, "Is that okay with you?" He goes, "Man, that's great. Now I got a new customer."

And at that point—and this is what hits me—he reached over to Mike and shook his hand and says, "Welcome to the ADT family," like a good salesman should.[2]

Michael Gangi also recalled this meeting:

Well, Bubby [Reuther] called up ADT because he pays them for a year in advance, okay? A gentleman comes out. Bubby introduces me to him., which I don't remember his name.... And Bubby says, hey, he's buying the business, he's taking it over. I'm going to transfer over my policy, my contract with ADT to Mr. Gangi. And no problem. And he said he wants you to change the codes. I said, I want to change the codes. And I don't remember the exact code numbers, but he came there, changed the panel and everything.

\* \* \* \* \* \*

He changed the code and, you know, Bubby said he's going to transfer it over. Well, at that point I thought everything was transferred into my name.

---

1. Depo. Clarence G. Reuther, November 12, 2003, at 37.

2. *Id.* at 41–43.

And we even said when it comes up due, come see me or before it comes up due, come see me and we'll renegotiate the contract. I said, no problem. That was my last understanding, you know.[3]

Gangi testified that he never learned the expiration date of the prepaid term of the contract. When asked at his deposition about his understanding of the expiration date, Gangi stated that "Bubby just told me he just paid it in full, blah, blah, blah. I had no idea what day. I figured I'd get notice."[4] He also indicated that "That's like if you ask me when my insurance, my car insurance is due. I don't know until I get the bill. . . . . I mean, I got enough bills coming to me. You know, I can't keep track of everything."[5]

ADT employee Jefferson also recalled the meeting. Jefferson "told him [Michael Gangi] what the current rate was for monitoring, and I informed him of how much time was left on the agreement, and he was aware, at that time, exactly what the current rate was and that he said that he thought that rate was a bit high."[6] Jefferson "told him that I would speak with my boss and see what I could do to give him a lower price."[7]

It is undisputed that no new contract was thereafter executed between Gangi and ADT. Gangi testified that Jefferson "never brought it [a new contract] back out to me. He was supposed to come negotiate before that contract run out to re-issue me a new thing."[8] Jefferson testified that he prepared a new contract for Gangi and dropped it off at the Mazant Street facility prior to the expiration of the term of the Reuther–ADT contract, but that he was never contacted about it.

When the prepaid term of the contract between Reuther and ADT was about to expire, ADT sent Reuther a letter reminding it to pay the new annual premium. On July 23, 1999, Reuther sent a fax to ADT noting "Reuther's Sea Food Co., Inc. no longer owns the building at 600 Mazant St., New Orleans, LA. Thank you." It is undisputed that no additional notice was provided to Gangi about the expiration of the contract. It is also undisputed that the local alarm service in place at the Mazant Street facility continued to operate, but that ADT's monitoring of the fire and burglar alarms ceased in July 1999.

The contract did not contain any provision requiring ADT to notify Reuther when the renewal amount was due. Reuther testified at his deposition that "[t]he way that that would normally work with ADT is every year when a contract would be about, I don't know, may be six weeks from being due, I'd get a phone call followed by a visit with a new proposal from whoever was calling on me from ADT at the time. And that changed almost yearly. Sometimes you would get a guy from Houston. Sometimes you'd get Ed Jefferson."[9] Jefferson testified at his deposition concerning ADT's policy regarding notice:

If a customer didn't pay his bill, then the Accounting Department had a procedure as far as they would try to find out why the customer wasn't paying his bill, and, at certain points, they would try to con-

---

**3.** Depo. Michael A. Gangi, September 20, 2002, at 167–68.

**4.** *Id.* at 170.

**5.** *Id.* at 171.

**6.** Depo. Edward L. Jefferson, November 3, 2002, at 88.

**7.** *Id.* at 90.

**8.** Depo. Gangi at 169.

**9.** Depo. Reuther at 39.

tact the customer to see why he wasn't paying the bill, and if they didn't get any type of response, then they would send out a notice saying that if the bill isn't paid by this time, then your services will be discontinued .... [10]

A fire completely destroyed the facility at 600 Mazant Street in December 1999. Gangi sued ADT, alleging that if the monitoring service had been in operation, the damages would not have occurred, or would have been less severe. Additionally, Gangi added its insurer, Lloyd's of London, as a party plaintiff because Lloyd's had paid Gangi for the property damage it had sustained.

Gangi's primary argument is that "[b]y virtue of its own promise and assurance to Gangi, ADT owed Gangi a special duty to notify him when ADT's security contract his property neared expiration, so that a renewal contract could be signed." [11] Gangi argues alternatively that it detrimentally relied on ADT's promise to "notify Gangi when the contract neared expiration"; and that it was subrogated to the ADT–Reuther contract, and that ADT breached the contract by not providing notice of its termination.[12]

## B. Analysis.

### 1. Summary judgment standards

Rule 56 provides that summary judgment "shall be rendered forthwith" if the pleadings and evidence demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to prevent summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. The inferences the court may draw from the underlying facts in the affidavits, depositions, and exhibits "must be viewed in the light most favorable to the party opposing the motion." *McAvey v. Lee*, 260 F.3d 359, 363 (5th Cir.2001) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### 2. ADT's alleged liability in tort.

The Fifth Circuit Court of Appeals has held that under Louisiana law, the test for determining liability for negligent conduct has five components:

(1) Was the conduct of another of which the plaintiff complains a cause-in-fact of the resulting harm?

(2) What, if any, duties were owed by the respective parties?

(3) Whether the requisite duties were breached?

(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

(5) Were actual damages sustained?

*Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir.2004). The issue of whether a duty exists is a question of law, and the issue of whether a defendant "has *breached* a duty is a question of fact." *Id.* at 489 (italics in original). In determining whether a duty exists, the court must consider several factors:

In deciding whether to impose a duty in a particular case, the court must make a

---

**10.** Depo. Jefferson at 43–44.

**11.** Document 72 at p. 3.

**12.** *Id.* at pp. 5, 7.

policy decision in light of the unique facts and circumstances presented. The court may consider various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving.

*Posecai v. Wal–Mart Stores, Inc.,* 752 So.2d 762, 766 (La.1999); *see also Bursztajn,* 367 F.3d at 489 ("To determine whether a duty exists, a court is required to make a policy determination based on 'various moral; social; and economic factors.' ").

■ The fundamental issue in this case is whether, as a matter of law, an alarm monitoring company has a duty to notify a premises owner when the monitoring contract covering the premises has lapsed. Gangi alleges that ADT "was grossly negligent in failing to notify, either informally or formally, Gangi or Reuther that the business was no longer being monitored regarding security breaches and fire alarms. ADT's negligence was the proximate cause in the fire consuming the plaintiff's business."[13] Gangi specifically argues that a duty exists because:

advance notice and warning prior to termination of recurring contract and consumer service has been of such long standing, and so universally applied, that it is expected and relied upon by consumers. Consider, for example, the warnings and notices of delinquency and threat of termination give by holders of mortgage notes, suppliers of electricity, gas and water, telephone and television

services, credit card companies, insurers of life and property, and bankers.[14]

The court finds that no such duty exists. In the examples cited by Gangi, a statutory or contractual provision often requires notice to the contracting party that a service is about to expire. In other cases, the notification is a courtesy or a marketing tool to encourage a renewal of the contract. There is no duty requiring ADT to notify Gangi of the termination of its monitoring service.

### 3. Detrimental Reliance.

■ Gangi argues that it detrimentally relied on ADT's alleged promise to notify it when the contract neared expiration. Article 1967 of the Louisiana Civil Code codifies the theory of detrimental reliance, stating that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment." To recover for detrimental reliance, "the party must prove the existence of a promise and reasonable reliance on that promise to the party's detriment. In addition, a claim of detrimental reliance must meet three requirements: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change in position to one's detriment because of the reliance." *Service Steel and Pipe, Inc. v. Guinn's Trailer Sales, Inc.,* 850 So.2d 902, 907 (La.App. 2d Cir.2003).

Gangi's argument fails at the first prong of the test. There is no evidence to support Gangi's argument that ADT made any representations that it would notify Gangi of the termination of the contract.

### 4. ADT's alleged liability for breach of contract.

■ Gangi argues that when it purchased the Mazant Street facility, it be-

---

**13.** Petition at ¶ 6.

**14.** Document 72, at pp. 3–4.

came subrogated to all of Reuther's rights under the contract between ADT and Reuther, including the right to receive notice of the contract's expiration. Assuming Gangi did become subrogated to Reuther's rights, he had no greater rights in the contract than Reuther. The contract contained no provision requiring notice. ADT did not breach the contract by failing to notify Gangi of its expiration.

## C. Conclusions.

ADT's motion for summary judgment is granted.

### JUDGMENT

Considering the written Order and Reasons (record document # 90) of the court;

IT IS ORDERED, ADJUDGED, AND DECREED, that there be judgment in favor of defendant ADT Security Services, Inc. and against plaintiff Gangi Seafood, Inc., dismissing plaintiff's claims against ADT Security Services, Inc.